1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10    CARLOS WILLIAMS,                    CASE NO. C21-5536 MJP

11                    Plaintiff,          ORDER GRANTING
                                          DEFENDANTS' MOTION FOR
12          v.                            SUMMARY JUDGMENT

13    LORI LAWSON, et al.,

14                    Defendants.

15

16          This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt.

17    No. 307) and Motion to Reopen Discovery (Dkt. No. 333). Having reviewed the Motions,

18    Plaintiff Carlos Williams' Response to the Motion for Summary Judgment that was also labeled

19    a "Cross Motion" (Dkt. No. 345), the Reply (Dkt. No. 346), and all supporting materials, the

20    Court GRANTS Defendants' Motion for Summary Judgment and DENIES Defendants' Motion

21    to Reopen Discovery as MOOT.

22

23

24

**BACKGROUND**

On July 31, 2018, Plaintiff Carlos Williams was brutally attacked by another inmate, Alex Burton, while in the close custody general population at Clallam Bay Correctional Center (CBCC). Williams brings four federal and state law claims against the State of Washington, the Department of Corrections (DOC), and various prison officials and mental health providers, who he believes failed to protect him from the assault. First, Williams alleges that State, DOC, and the prison officials and mental health providers violated the Eighth Amendment by failing to protect him from the assault. (Amended Complaint (AC) ¶¶ 97-105 (Dkt. No. 61).) Second, Williams alleges that he was improperly housed in the general population as retaliation for exercising his First Amendment rights to file complaints and grievances and because of his disability. (Id. ¶¶ 106-09.) Third, Williams alleges the Defendants violated the Americans with Disabilities Act (ADA) by placing him in the general population at CBCC and keeping him there. (Id. ¶¶ 110-16.) Fourth, Williams alleges that Defendants acted negligently by placing him the general population, failing to protect him, ignoring warnings, and not providing adequate medical assistance after the assault. (Id. ¶¶ 117-20.) The Court review the facts relevant to the claims and Defendants' pending Motion for Summary Judgment.

**A.    Williams' Assignments within DOC and His Transfer to CBCC**

Williams has a long history of severe mental illness and has been housed in various specialized and mental health units in DOC since the 1990s. (AC ¶¶ 21-39.) DOC has diagnosed Williams with schizoaffective disorder, bipolar disorder, and a neurocognitive disorder. (AC ¶ 32; see Expert Report of Dr. Marnee Milner at 6 (Dkt. No. 301-1) (noting a prior diagnoses of Bipolar Disorder and Unspecified Personality Disorder with paranoid, antisocial, and narcissistic features, and a recent manic episode with psychosis).) Williams has been classified and housed

in mental health or other special units within DOC for the vast majority of his incarceration. (AC ¶ 24.) Williams made known to DOC that he prefers not to be housed in the general population and that he does not do well with cellmates, particularly given his sex offense convictions and mental health. (AC ¶¶ 25, 30-31.)

Prior to his transfer to CBCC, Williams spent several years at Stafford Creek Corrections Center (SCCC), including at the Intensive Management Unit (IMU) at SCCC. (AC ¶¶ 35, 41.) Immediately prior to transfer to CBCC, Williams resided in the IMU at SCCC. (Id.) The IMU is "essentially administrative segregation or solitary confinement where inmates get one hour per day outside their cell, five days a week." (Id. ¶ 42.)

On January 31, 2018, the DOC transferred Williams from SCCC to CBCC. (Exhibit 10 to the Declaration of Jesse Pearson at 22 (Dkt. No. 315-10).) Although Williams claims the transfer was done in retaliation, there is no evidence of retaliation. Indeed, Williams advocated for release from the SCC IMU in 2017, and argued that his assignment to max custody was done as retaliation for filing a civil suit against DOC. (Pearson Ex. 10 at 12.) Williams asked for placement in medium custody, which his DOC counselor also recommended in light of Williams' completion of various courses and programs. (Id. at 5, 12-13.) Ultimately, in early 2018, the Facility Risk Management Team (FRMT) decided to release Williams from max custody and release him to close custody while transferring him to CBCC. (Id. at 18.) At CBCC, Williams resided in the general population except for two instances when he was temporarily placed into segregation for disciplinary reasons. (Expert Report of Wanda McRae at 5, 8 (Dkt. No. 306-1).)

According to the Court's neutral classification expert, Wanda McRae, Williams' transfer both met DOC policy and made sense for his particular circumstances. (McRae Report.) McRae

1  opines that Williams' "transfer and the review process conducted by the sending facility (SCCC)

2  and the receiving facility (CBCC) met the criteria of the DOC transfer policy." (Id. at 7.) She

3  further concludes that "[p]lacement in close custody population was appropriate and compliant

4  with DOC Classification Policy." (Id.) McRae also concludes that "[t]he transfer was not

5  retaliation but an opportunity to provide a pathway to earning lower custody classifications and a

6  behavioral programming plan that includes programming, and privileges." (Id. at 5.) McRae

7  believes that "[t]ransfer to CBCC was appropriate and afforded Mr. Williams with opportunities

8  to attend programs and work." (Id. at 7.)

9  **B.    Williams' Assault at CBCC**

10      For reasons unknown, Alex Burton, an inmate at CBCC, assaulted Williams on July 31,

11  2018. A video of the incident filed with the Court shows the two exchange words and then

12  quickly begin to fight. (See Dkt. No. 252 (noting Court's possession of USB storage devices

13  containing the video of the assault).) Burton knocked Williams to the floor and stepped

14  repeatedly on his head. Within seconds, DOC staff arrived and began to attend to Williams, with

15  a nurse arriving roughly six minutes later. (Milner Report at 2.) Williams was placed on a

16  stretcher roughly fifteen minutes later and transported to Forks Community Hospital ER and then

17  to Harborview on August 1, 2018 for neurosurgical management. (Id.) Williams suffered a

18  subdural hematoma and spent two months at Harborview to complete inpatient rehab. (Id. at 3.)

19      It does not appear that Burton or Williams were acquaintances or that the assault was the

20  result of a grievance or prior conflict. Though Williams knew Burton by face and from "Islamic

21  greetings," he never had any direct conversations with him before the incident. (Exhibit C to the

22  Declaration of Michelle Hansen at 4 (Dkt. No. 308-3 at 2-4).) Burton also disclaimed knowing

23  Williams (Hansen Decl. Ex. B at 4 (Dkt. No. 308-3 at 4).)

24

**C.**    **Williams Mental Health Decline in 2018 at CBCC**

Before Williams was assaulted, he complained to DOC at CBCC staff about his fears of being attacked. Given the nature of Williams' claims, the Court reviews the precise nature of his complaints leading up the July 31st attack.

Between February 13, 2018 and July 25, 2018, Williams filed twenty-five complaints, of which DOC staff accepted only three as formal grievances. (McRae Report at 6.) Through these complaints, Williams noted several issues, including concerns about his safety. (AC ¶ 51.) As McRae explains, while Williams' "initial complaints were written legibly and included his problems," his "complaints written in July were poorly written, with no focus, showing a digression of his ability to communicate either through written or verbal exchanges." (McRae Report at 8.) The Court reviews three complaints that are most relevant to the pending Motion.

On July 11, 2018, Williams filed a complaint "against racist, aaryian [sic], white supremist [sic] Klu-Klux-Klansmen operating this facility for: Retaliation against inmates who filed grievances concerning no wifi at this facility by disconnecting all J-Pay access." (Pearson Decl. Ex. 1 (Dkt. No. 315-1).) The DOC rejected the grievance, asking for more information about "who you are grieving [about] and when the incident occurred." (Id.) Williams did not supplement this grievance.

On July 20, 2018, Williams submitted a typed complaint against CBCC "staff and certain officials" who he believed were "conspiring" against him and who had "[p]lans to have [Williams] sexually assaulted" as "retaliation for exposing various mail fraud, embezzlement of Global Tel Link inmate accounts, and over billing in the medical offices." (Pearson Decl. Ex. 2. (Dkt. No. 315-2).) Williams wrote that "[t]hey pay inmates to assault certain inmates w/ sex offenses." (Id.) He also noted that "this facility is packed full of racist, Aaryian [sic], White

Supremist [sic], Neo-nazi, and Klu-Klux-Klansmen." (Id.) The DOC staff returned the complaint with a note: "Please be specific on who & when the incident occurred." (Id.) Williams filed no appeal.

On July 27, 2018, Williams submitted a hand-written complaint "against certain racist CBCC officials who have instructed the muslims to attack me at Friday Jumah Service, today." (Pearson Decl. Ex. 3 (Dkt. No. 315-3).) Williams noted that this was in retaliation for his prior grievances, including the two noted above. (Id. (noting the grievance numbers in Pearson Decl. Exs. 1 and 2).) Williams asked for "extra staff [to] be assigned to monitor/prevent any assaults at Friday Jumah Services." (Pearson Decl. Ex. 3.) In response, the grievance coordinator wrote "you need to be specific in your complaint. Who are you grieving, what did they do, and when did it happen." (Id.) That same day, Williams submitted a typed revision to the same grievance, stating "certain CBCC officials [were] conspiring amongst themselves and w/ 'loose-lip' inmates to assault me or worse at the Jumah services today, in the chaple [sic]; or enroute in the foyer, rotunda." (Pearson Decl. Ex. 3 (Dkt. No. 315-3 at 2).) He stated that this was in "retaliation" for the same grievances listed in the grievances he filed before. (Id.) Although the grievance coordinator did not "accept" the grievance, the author wrote "you have been removed from Jumah Services so this is no longer an emergency." (Id.) It also appears that Williams "appealed" this to the Associate Superintendent or Superintendent, but there is nothing in the record explaining what happened to the appeal. (Id. at 3.)

On July 27, 2018, Williams also filed a written request to be seen by a mental health provider. (Declaration of Ginger Gunn ¶ 10 (Dkt. No. 311).) The shift supervisor, Lt. Delong, spoke with Defendant Ginger Gunn, a DOC psychologist, and asked Gunn to "meet with Mr. Williams to address the behaviors." (Id.) Defendant Gunn tried to meet with Williams on July

27, 2018, but Williams declined to be seen, telling a different officer "I'm not suicidal. I'm not homicidal. I want to be left the fuck alone." (<u>Id.</u>)

Defendant Gunn then met with Williams on July 30, 2018, as a follow up to his July 27th request. (<u>Id.</u> ¶ 11.) Williams told Gunn during this interview that he refused to be seen on July 27 because "[t]hey were going to murder me." (<u>Id.</u>) When asked who "they" referred to, Williams stated that "they" were "[t]he negative forces." (<u>Id.</u>) Gunn wrote: "[W]hen asked who would kill him, he [Williams] stated, looking sideways as if to question why I continue to ask, 'I said before, it's the negative forces. I don't want to name them right now.'" (<u>Id.</u>) Williams also stated he "anticipated that 'someone was going to kill me up here'" because "'it's so isolated.'" (<u>Id.</u>) Gunn believed that Williams had identified "somewhat bizarre persecutory delusions" that reflected the fact he "appear[ed] to be psychiatrically decompensating." (<u>Id.</u>) In her notes of the July 30th encounter, Gunn wrote that she would "attempt to meet with Mr. Williams within the next 1 to 2 weeks to assess him further." (<u>Id.</u>) But Gunn also "consulted with Psychiatrist Dr. Leyster and . . . referred Mr. Williams for an in-house psychiatric evaluation as soon as practicable." (Gunn Decl. ¶ 11.) Gunn asserts that this was an appropriate level of care and that the appointment was scheduled for August 2, 2018, with a follow-up psychological assessment within two weeks. (<u>Id.</u> ¶ 12.)

According to Defendants, Gunn's decision to refer Williams for an evaluation complied with DOC policy. According to DOC Policy, "[e]mployees/contract staff observing behavior that may indicate a mental health issue exists should make an appropriate and timely referral using DOC 13-420 Request for Mental Health Assessment." (DOC Policy Directive 320.255 § VII(C) (Gunn Decl. Ex. E (Dkt. No. 311-13 at 11)).) But the same Policy specifies that "[i]f the need is emergent, the employee/contract staff will immediately notify the Shift Commander, who will

assess the individual's condition and take appropriate action." (DOC Policy Directive 320.255 § VII(C)(1).) The Policy also states that "[i]f significant mental health deterioration is determined, recommendations will be made for alternative placement to better meet the mental health needs of an individual." DOC Policy Directive 320.255 § VII(B)(2).

Although Gunn does not state so explicitly, she did not immediately contact the shift commander or identify an "emergent" need for further help. Gunn states that "[w]hile I was aware of [Williams'] concern that someone at CBCC was trying to harm him, I had no knowledge or belief that Mr. Williams might be at a substantial risk of harm from any specific person." (Gunn. ¶ 14.) And while Gunn claims she could not decide Williams' housing, she admits she could have made a recommendation to custody staff and/or leadership. (Id. ¶ 18.)

The Court's classification expert, McRae, opines that Williams' "decompensation warranted sharing this information [that Williams disclosed to mental health staff and grievance coordinators in July 2018] with the custody and treatment staff or Multidisciplinary team review." (McRae Report at 9.) She concludes that "the incidents and responses made prior to the assault warranted that Mr. Williams should have been placed in Segregation before the assault pending completion of investigation." (McRae Report at 9.) But McRae does not specifically opine as to whether or not Gunn's response was unreasonable.

**D.    Williams' Claims**

Williams pursues four claims against a variety of defendants, which the Court reviews.

First, in his Eighth Amendment claim, Williams alleges that Gunn, the DOC, the State of Washington, the superintendents and associate superintendents of both SCCC and CBCC, and three members of the Facility Risk Management Team (FRMT) who approved the transfer, failed to protect him. He also asserts this claim against four "Doe" defendants, who are identified in the

pleadings as "employees of the DOC and working at and/or with CBCC and/or SCCC, and involved in, administered, and/or supervised others charged with making classification, housing, and/or placement decisions by whatever title within the DOC system, including but not limited to, captain(s), Administrative Lieutenant, caseworker(s), Chief of Classification/designee, health services/mental health provider, intelligence and investigations employee, and other employee/contract staff involved in supervision/treatment and/or members of a Headquarters Classification Unit." (AC ¶ 14.)

Second, Williams pursues a retaliation claim against the same defendants named in his Eighth Amendment claim, alleging that they improperly classified him for close custody at CBCC for retaliatory reasons. (AC ¶¶ 106-09.) He claims that he was retaliated against because of his disability (severe mental illness) or his numerous complaints, grievances, and Public Records Act requests. (Id. ¶¶ 44-45, 48-50, 106-09.) The Court construes this as a claim for retaliation under the ADA and the First Amendment.

Third, Williams alleges that the same defendants named as to his Eighth Amendment claim violated the ADA by failing to place him into protective custody after they observed his mental health decline from February to July 2018. (AC ¶¶ 110-16.)

Lastly, Williams pursues a claim of negligence against all Defendants, which includes the last defendant, Mandy Forsman, a registered nurse who treated Williams the night of the attack. (AC ¶¶ 13, 117-20.) Williams alleges that Defendants acted negligently by: (1) failing to keep him safe from other inmates who posed a threat; (2) failing to place him in segregation or a mental health unit: (3) failing to classify Williams for a mental health unit; and (4) ignoring warnings from Williams about his safety. (AC ¶ 118.)

1

**ANALYSIS**

2

**A.    Legal Standard**

3          Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

4   file, and any affidavits show that there is no genuine issue as to any material fact and that the

5   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

6   an issue of fact exists, the Court must view all evidence in the light most favorable to the

7   nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty

8   Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is

9   sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The

10  moving party bears the initial burden of showing that there is no evidence which supports an

11  element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

12  Once the movant has met this burden, the nonmoving party then must show that there is a

13  genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the

14  existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

15  matter of law." Celotex, 477 U.S. at 323-24.

16

**B.    Deliberate Indifference**

17         Williams's Eighth Amendment claim turns on allegations that the various Defendants

18  failed to protect him both by transferring him to CBCC and by failing to place him into

19  segregation after he identified his fear of being attacked. After reviewing the legal standard, the

20  Court examines the claim as to each named Defendant, noting that Defendant Forsmann is not

21  named as to this claim. Williams has not identified sufficient evidence to sustain this claim

22  against any of the Defendants, and the Court GRANTS summary judgment in Defendants' favor.

23

24

1      **1.      Legal Standard**

2      "The Eighth Amendment requires prison officials to protect inmates from violence."

3      Wilk v. Neven, 956 F.3d 1143, 1147 (9th Cir. 2020) (citing Farmer v. Brennan, 511 U.S. 825,

4      833 (1994)). "It is not, however, every injury suffered by one prisoner at the hands of another

5      that translates into constitutional liability for prison officials responsible for the victim's safety."

6      Farmer, 511 U.S. at 834. A prison official's failure to protect inmates from attacks by other

7      inmates violates the Eighth Amendment only where two requirements are met: (1) an objective

8      component, requiring a prisoner to show that that "conditions pos[e] a substantial risk of serious

9      harm;" and (2) a subjective component, requiring a prisoner to show that the defendant was

10      aware of the risk and disregarded it. Id. "Specifically, a prison official violates an inmate's

11      Eighth Amendment right only if that official is 'deliberately indifferent'—in other words, if the

12      official is subjectively aware of a substantial risk of serious harm to an inmate and disregards

13      that risk by failing to respond reasonably." Wilk, 956 F.3d at 1147. A fact-finder may infer

14      subjective awareness from circumstantial evidence. Farmer, 511 U.S. at 842. But "[i]f a [prison

15      official] should have been aware of the risk, but was not, then the [official] has not violated the

16      Eighth Amendment, no matter how severe the risk." Gibson v. Cnty. of Washoe, 290 F.3d 1175,

17      1188 (9th Cir. 2002) overruled on other grounds by Castro v. Cnty. of Los Angeles, 833 F.3d

18      1060, 1076 (9th Cir. 2016) (en banc).

19      **2.      Claims Against Gunn**

20      Williams alleges that psychologist Gunn knew his delusional behavior and

21      decompensation and that she should have caused him to be placed in segregation before the

22      attack. Notwithstanding the evidence that Gunn was insensitive to Williams' concerns, Williams

23

24

1    has not identified sufficient evidence needed to get over the high threshold to pursue an Eighth

2    Amendment claim.

3         The first problem for Williams is that his decompensation itself did not present a

4    substantial risk of serious harm. Williams has a long history of mental health problems and when

5    Gunn interviewed him the day before the assault, she concluded that Williams' concern about

6    being attacked was part of "somewhat bizarre persecutory delusions" that reflected his

7    "psychiatric[] decompensati[on]." (Gunn Decl. ¶¶ 11-12 & Ex. A-1.) She did not note any

8    specific concerns that his decompensation posed an imminent risk to his safety. She noted that he

9    was not suicidal or homicidal, and when she pressed him on who he believed was going to kill

10   him, he refused to identify any specific person or group—just calling them "the negative forces."

11   (Id. Ex. A-1.) There is nothing in Gunn's notes indicating a substantial risk of serious harm and

12   Williams himself has not identified any reason why his mental decline and paranoia "pos[ed] a

13   substantial risk of serious harm." Farmer, 511 U.S. at 834. And while McRae's report reasonably

14   notes that staff was desensitized to Williams and his decompensation, she does not opine that his

15   mental health deterioration alone posed a substantial risk of serious harm. (McRae Report at 8-

16   9.) At most, McRae believes that Williams' decompensation warranted segregation pending an

17   investigation. But nowhere does she identify why his mental health decline itself constituted a

18   substantial risk of serious harm. While the Court agrees with McRae that staff, including Gunn,

19   showed a lack of empathy for Williams, that alone does not satisfy the deliberate indifference

20   standard.

21        The second problem for Williams is that his concerns about being attacked did not put

22   Gunn on notice of an objective and substantial risk of serious harm. Williams failed to present

23   Gunn with any objective evidence of a specific threat against him. Williams did not specify who

24

1    might wish to attack him, and all indications to Gunn were that his fear of being hurt were part of

2    "persecutory delusions" stemming from his decompensation. He only referred to "negative

3    forces," not a particular inmate. And Williams had no foresight that Burton might attack him, as

4    neither he nor Burton were acquainted before the assault. Williams' fears were abstract and not

5    sufficiently specific to amount to objective evidence of a threat to his safety. The facts presented

6    contrast with two other cases where the Ninth Circuit found a risk of attack was sufficiently clear

7    to sustain an Eighth Amendment claim. In <u>Wilk</u>, the plaintiff presented evidence that the

8    defendants were well aware that another inmate wished to attack him if the two were to

9    encounter each other. <u>Wilk</u>, 956 F.3d at 1149. And in <u>Castro</u>, the court noted objective evidence

10   of a substantial risk of serious harm when the defendants placed the plaintiff "in a cell with a

11   combative inmate, when the cell had no audio or video surveillance and only occasional

12   monitoring." <u>Castro</u>, 833 F.3d at 1067 (considering a jury's verdict and qualified immunity on a

13   Fourteenth Amendment claim). Here, in contrast, there was no evidence that Williams faced a

14   threat from a specific inmate given the lack of specificity in his complaints to Gunn. Nor is there

15   evidence showing that Williams faced a threat from Burton, as there was apparently no prior

16   relationship or bad blood. The Court also notes that when Williams did identify his fears about

17   being attacked at a specific place—the Jumah services—the prison officials forbade his

18   attendance to protect him.

19        The Court finds that Gunn is entitled to summary judgment on Williams' Eighth

20   Amendment claim because the facts are insufficient to show that Gunn knew of a substantial risk

21   of serious harm to Williams. On this basis the Court GRANTS Summary Judgment in Gunn's

22   favor on this claim.

23

24

1        **3.      Claims Against Doe Defendants**

2        Williams' Amended Complaint includes claims against four Doe defendants, which

3    include "the psychologist's team." Williams has not identified any of these individuals at any

4    point since filing the Amended Complaint. But even if he had, there is no greater evidence

5    against any member of the psychologist's team than has been levied against Gunn. For the same

6    reasons as explained above as to Gunn, the claim against any Doe defendants cannot proceed.

7    The Court therefore GRANTS summary judgment as to the Doe defendants on Williams' Eighth

8    Amendment claim.

9        **4.      Claims against the State of Washington and DOC**

10       Williams cannot pursue claims against the State of Washington and DOC under § 1983

11   because he has not identified any policy, custom, or practice that might support his deliberate

12   indifference claim.

13       "A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy,

14   practice, or custom of the entity can be shown to be a moving force behind a violation of

15   constitutional rights." Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011) (citing

16   Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 694 (1978)). "In order to

17   establish liability for governmental entities under Monell, a plaintiff must prove '(1) that [the

18   plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality

19   had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional

20   right; and, (4) that the policy is the moving force behind the constitutional violation.'" Id.

21   (quoting Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill, 130 F.3d 432, 438 (9th Cir.1997)

22   (internal quotation marks and citation omitted; alterations in original)).

23

24

Construing the facts in the light most favorable to Williams, the Court finds an absence of evidence that any deprivation of Williams' rights was the result of a policy, custom, or practice that might constitute deliberate indifference. At most, Williams asserts that those in charge should have been aware of the risk of not placing him in segregation at or around the time of the assault. But he does not identify any policy, custom, or practice that was followed to deny him any such segregation or protective custody. Accordingly, the Court GRANTS summary judgment on this claim as to the State and DOC.

### 5.    Claims Against Lawson and Boe

There are inadequate facts to support a deliberate indifference claim against the CBCC Superintendent Jeri Boe and CBCC Assistant Superintendent Lori Lawson. There are not facts showing that they were aware of the risk of Williams being attacked. As McRae's report details, Lawson should have, but did not receive any of Williams' grievances concerning his fears of being assaulted. (McRae Report at 8.) And there are no facts showing Boe was aware of any of the grievances, either. As the Ninth Circuit has stated: "[i]f a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." Gibson, 290 F.3d at 1188. Without evidence of their knowledge of the risk, these individuals cannot be liable. The Court therefore GRANTS summary judgment in Boe and Lawson's favor on this claim.

### 6.    Claims Against Haynes and Van Ogle

Williams alleges that Ronald Haynes and Dan Van Ogle, the superintendent and assistant superintendent at SCCC, respectively, were deliberately indifferent by allowing him to be classified for transfer to CBCC. But there are no facts showing that either Van Ogle or Haynes was aware of any specific or substantial risk of harm in transferring Williams to CBCC. As

McRae opines, "[t]ransfer to CBCC was appropriate and afforded Mr. Williams opportunities to attend programs and work." (McRae Report at 7.) McRae elaborates that "[t]he transfer and the review process conducted by the sending the facility (SCCC) and receiving facility (CBCC) met the criteria of the DOC transfer policy." (<u>Id.</u>) And McRae concludes that "[p]lacement in [the] close custody population unit was appropriate and compliant with DOC Classification policy." (<u>Id.</u>) There is nothing in the record suggesting that either Van Ogle or Haynes was deliberately indifferent to Williams' needs or that his transfer itself was improper. The Court therefore GRANTS summary judgment in Haynes' and Van Ogle's favor on this claim.

### 7.    Claims Against Osborne, Newman, & Daracunas

Williams alleges that Scott Osborne, Geraldine Newman, and Joseph Daracunas, three members of the Facility Risk Management Team (FRMT) who decided his housing classification, acted with deliberate indifference. These claims fail because Williams has not identified evidence to show that any member of the FRMT was aware of any specific risk of attack or harm if he was moved to close custody at CBCC. As alleged, the FRMT met in February 2018 to discuss Williams' placement. (<u>See</u> AC ¶¶ 8-11.) There are no facts showing that the members knew at that time of any risk of harm. As McRae concludes, "[t]he FRMT did not have an emergent need to review Mr. Williams' custody classification or current facility placement between January 31, 2018 and July 31, 2018. (McRae Report at 7.) There are therefore insufficient facts to support a deliberate indifference claim against these individuals and the Court GRANTS summary judgment in these Defendants' favor as to this claim.

### 8.    Qualified Immunity

Because the Eighth Amendment claims fail on their merits, the Court does reach the question of qualified immunity.

**C.    Retaliation Claims**

The Court finds inadequate facts on the record could be construed in Williams' favor to support his retaliation claims against any of the named Defendants.

First, there is no evidence before the Court that the decision to transfer Williams to CBCC was retaliatory. As McRae concludes, the decision was not retaliatory and was instead motivated by a desire to allow Williams access to greater programming and facilities. (McRae Report at 5, 7, 8.) Williams identifies no evidence to support his claim that his transfer to CBCC or his placement in "close custody" general population was retaliatory. And these claims cannot be made against Gunn, as she had no role in his transfer. Nor has Williams identified any basis for <u>Monell</u> liability against DOC and State given the lack of evidence of retaliation.

Second, there is no evidence that Defendants' decision to keep Williams in the general population was done for a retaliatory purpose. While McRae identifies indifference to Williams' complaints, there is no evidence that any Defendant's action or refusal to act was motivated by Williams' history of filing grievances or his mental illness or any other disability. This is fatal to the claims. These claims fail for several additional reasons as to certain Defendants. The claims cannot proceed against Gunn because she was not aware of his grievances. As to DOC and the State, there is no basis of <u>Monell</u> liability because no policies, customs, or practices are identified as the moving force of the injury. And the claims cannot proceed against the superintendent and associate superintendent at SCCC, because they had no oversight of Williams at CBCC.

On this record, the Court GRANTS summary judgment in Defendants' favor.

**D.    ADA Claim**

Williams has not provided sufficient evidence to sustain his ADA claim.

1    A claim for discrimination under the ADA requires "four elements: (1) [the plaintiff] is

2  an individual with a disability; (2) [the plaintiff] is otherwise qualified to participate in or receive

3  the benefit of some public entity's services, programs, or activities; (3) [the plaintiff] was either

4  excluded from participation in or denied the benefits of the public entity's services, programs, or

5  activities, or was otherwise discriminated against by the public entity; and (4) such exclusion,

6  denial of benefits, or discrimination was by reason of [the plaintiff's] disability." McGary v. City

7  of Portland, 386 F.3d 1259, 1265 (9th Cir. 2004) (citation and quotation omitted).

8    Absent from the record before the Court is any evidence that the transfer to CBCC, the

9  classification at CBCC, or the failure to put Williams into segregation at CBCC was "by reason

10  of [Williams'] disability." McGary, 386 F.3d at 1265. At most, Gunn and the grievance officers

11  were aware that Williams was suffering from declining mental illness. But Williams has not

12  shown that these individuals failed to place him in segregation or wrongly classified him in the

13  general population because of his mental illness. Indeed, when Williams did identify a fear of

14  being attacked at the Jumah services, he was kept in his cell for protection. And Williams

15  himself never sought protective custody. Given the inadequate evidence of causation, the Court

16  GRANTS summary judgment in Defendants' favor on this claim.

17  **E.    Negligence Claims**

18    Williams' negligence claims fail for lack of evidence of a breach of duty.

19    Williams' claims related to the failure to protect him at CBCC lack evidence that any

20  defendant ignored a reasonable threat of injury. "Washington courts have long recognized a

21  jailer's special relationship with inmates, particularly the duty to ensure health, welfare, and

22  safety." Gregoire v. City of Oak Harbor, 170 Wn.2d 628, 635 (2010). "The standard of care is

23  one of ordinary, reasonable care, under the circumstances of each particular case." Matter of

24

1    <u>Pauley</u>, 13 Wn. App. 2d 292, 320 (Div. I 2020) (citing <u>Kusha v. McCorkle</u>, 100 Wash. 318, 323

2    (1918)). For prison officials to be liable "there must be proof of knowledge on the part of prison

3    officials that such an injury will be inflicted, or good reason to anticipate such, and then there

4    must be a showing of negligence on the part of these officials in failing to prevent the injury."

5    <u>Winston v. State/Dep't of Corr.</u>, 130 Wn. App. 61, 64 (Div. III 2005). Here, there is no evidence

6    that anyone was reasonably aware that Williams would be injured or attacked. As explained in

7    the Court's analysis of Williams' Eighth Amendment claim, the most Williams can show is that

8    the Defendants knew he was decompensating, but not that this decline posed a knowable risk of

9    injury. For these reasons, the negligence claims related to the attack cannot proceed.

10          Williams' claims related to the classification decision also lack merit. There is nothing in

11   the record suggesting what duty Defendants owed and why the decision to move him from

12   SCCC to CBCC violated that duty. As McRae opines, the decision to transfer Williams and place

13   him in close custody made sense. This claim cannot proceed.

14          Williams' claim against Defendants for failing to provide proper care in response to his

15   injuries fails on the merits. As Defendants note, the claim requires an expert to opine on the

16   standard of care. (Mot. at 20-21); <u>see</u> <u>Frausto v. Yakima HMA, LLC</u>, 188 Wn.2d 227, 231-32

17   (2017) ("With regard to the standard of care, we have repeatedly held that expert testimony will

18   generally be necessary to establish the standard of care." (citation and quotation omitted)). Here,

19   Williams has identified no evidence of what the standard of care should have been or how

20   Forsmann, the nurse who attended to him after the attack, or anyone else violated any standard of

21   care. The claim cannot proceed.

22          The Court therefore GRANTS summary judgment in Defendants' favor on these claims.

23

24

**F.    Procedural Matters**

The Court addresses two additional procedural matters.

First, the Court notes that it has considered Williams' "Cross Motion For Summary Judgment" (Dkt. No. 345) and construed it as a response brief, rather than a cross-motion. Williams was permitted to file this late response after two extensions from the Court. (Dkt. Nos. 342, 344.) But to the extent that Williams wished to file a cross motion, he failed to file it by the deadline or ask for an extension. For these reasons, the Court declines to construe it as a cross motion. Even if the Court did, it would not change the Court's analysis and decision that Defendants are entitled to summary judgment.

Second, the Court DENIES as MOOT Defendants' Motion to Reopen Discovery. Defendants expressed a desire to depose Wanda McRae, the Court's neutral classification expert. But given Defendants' success on their Motion for Summary Judgment, there is no need for McRae's deposition.

**CONCLUSION**

In deciding Defendants' Motion for Summary Judgment, the Court considered the evidence and arguments of Williams and Defendants, as well as the reports from both of the Court's neutral experts. Through the lengthy life of this case, the Court has tried its best to give Williams a fair opportunity to present his claims. After being tested at summary judgment, Williams has failed to identify any reason why this case should proceed to trial. Defendants are entitled to summary judgment in their favor on all claims. Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment, ENTERS summary judgment in Defendants' favor on all claims, and DENIES as MOOT Defendants' Motion to Reopen Discovery. This case shall be terminated and the Court directs entry of a separate judgment.

The clerk is ordered to provide copies of this order to Plaintiff and all counsel.

Dated October 30, 2024.

Marsha J. Pechman
United States Senior District Judge